UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

QUENTIN LEWIS,

                                     Petitioner,

            v.                                           9:04-CV-32 (LEK/GJD)

MICHAEL MCGINNIS, Superintendent,
Southport Correctional Facility,

                                    Respondent.

---

ANDREA HIRSCH, ESQ.
Attorney for Petitioner
111 Broadway
Suite 305
New York, NY 10006

ALYSON J. GILL, Assistant Attorney General
Attorney for Respondent

GUSTAVE J. DIBIANCO, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

     This matter has been referred to me for Report and Recommendation by the

Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

     Petitioner brings this action for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, challenging a judgment of conviction rendered on July 10, 2001 in the Greene

County Court. Petitioner was convicted by a jury of Manslaughter in the First Degree

(N.Y. PENAL LAW §125.20(1)) and was sentenced as a second violent felony offender

to determinate term of twenty-five years in prison.

     The Appellate Division, Third Department affirmed Petitioner's conviction on

December 19, 2002.  *People v. Lewis,* 300 A.D.2d 827, 752 N.Y.S.2d 172 (3d Dep't 2002).  The New York Court of Appeals denied leave to appeal on March 4, 2003. *People v. Lewis,* 99 N.Y.2d 630, 790 N.E.2d 285, 760 N.Y.S.2d 111 (2003).

Petitioner filed his first habeas petition on January 12, 2004.  Pursuant to an order signed by Judge Kahn on January 16, 2004, Petitioner filed an amended petition on February 6, 2004.  (Dkt. Nos. 1, 6, 7).  Respondent filed an answer and memorandum of law, along with the pertinent state court records, on July 1, 2004. (Dkt. Nos. 13, 14).  Petitioner filed a Traverse on July 21, 2004.  (Dkt. No. 15).

On August 23, 2005, Petitioner requested a stay so that he could exhaust two claims of trial counsel ineffectiveness in state court, and the stay was granted on April 6, 2006.  (Dkt. Nos. 24, 26, 27).  Petitioner filed a motion to vacate his conviction pursuant to New York Criminal Procedure Law ("CPL") 440.10 on or about April 18, 2006 in which he raised two claims of trial counsel ineffectiveness.  (Dkt. No. 38, Motion to Vacate Conviction).  The motion was denied on May 12, 2006.  (Dkt. No. 50, Exh. H).  An application for permission to appeal from the denial of the motion was denied on August 23, 2006.  (Dkt No. 50, Exh. I).

On November 17, 2006, attorney Andrea G. Hirsch was admitted *pro hac vice* to represent Petitioner in this court.  (Dkt. Nos. 34, 35).  On December 22, 2006, counsel filed a motion to amend the habeas petition to include the two newly exhausted ineffectiveness claims. (Dkt. No. 38).  This Court granted the motion to amend the petition in a Decision and Order dated April 19, 2007.  The stay was lifted, and Petitioner was directed to file the amended petition within thirty days.  (Dkt. No.

2

41). The second amended petition was filed on May 1, 2007. (Dkt. No. 42).

Petitioner raises the following grounds in support of his current habeas petition: (1) the evidence was insufficient and the verdict was against the weight of the evidence; (2) the trial court erred when it failed to give the jury the "moral certainty" circumstantial evidence charge; (3) the trial court erred when it allowed the shanks and a photograph of the shanks[1] to be admitted into evidence; (4) the trial court denied Petitioner his right to new counsel; (5) trial counsel was ineffective for not calling a witness to testify and for not alerting the court to an alleged Brady violation (Grounds Five, Eight and Nine); and (7) the sentence was harsh and excessive.  (Dkt. No. 42, Memorandum of Law in Support of Habeas Corpus Petition ("Mem.")).  Respondent has filed his answer to the amended petition, together with a memorandum of law and the additional pertinent state court records. (Dkt. Nos. 47 and 48).  After reviewing all of the submissions and the record, this Court agrees with respondent and will recommend denial of the petition.

## DISCUSSION

1. **Facts**

In June 2000, George Holden ("the victim"), Petitioner, and Eddie Buckley were inmates in Dormitory One at Coxsackie Correctional Facility in Greene County, New York.  (T. 363-64)  All of the inmates in this particular dormitory worked twelve-hour shifts in the kitchen, and when they finished, they were at liberty to move

---

[1] The term "shanks" refers to the weapons that were used to stab the victim in this case.

freely around the dormitory.  (T. 361-63).  The dormitory consisted of cubicles[2] that were separated by four-foot high partitions, but there were no bars separating the cubicles.  (T. 586).

On June 18, 2000, at approximately 5:20 p.m., Petitioner, the victim, and Buckley worked in the kitchen and were preparing to return to the dormitory. (T. 424-25). Inmates went to and from the kitchen in organized groups of ten, referred to as "go backs," at 5:30 and 6:00 p.m.  (T. 425).  The victim and Leroy Allen, Petitioner's cube-mate, had an argument over a broom.  (T. 425, 567).  They were delaying the 5:30 "go back," and Buckley approached the victim and asked him why he did not speed up.  (T. 426).  Buckley and the victim then exchanged words and then returned to the dormitory in the 5:30 p.m. group.  (T. 427-28, 363-65).

Miguel Roman also worked in the kitchen, and he returned to the dormitory in the 6:00 p.m. group.  (T. 428).  At approximately 6:30 p.m., he saw Buckley and the victim having "words" again.  (T. 428).  Buckley invited the victim to go to the back area of the recreation room, but the victim did not want to go.  (T. 430-31).  The victim repeatedly told Petitioner to stay in his cube, and that he and Buckley would go to the recreation room alone.  (T. 431-32).  The victim asked other inmates if they would give him a weapon, but no one gave him one.  (T. 432-33, 446-47).  He put on two sweaters before joining Buckley.  (T. 431-32).  Buckley and the victim argued, and then a physical altercation began.  (T. 432, 435, 447).  Buckley had a shank in his

---

[2] Cubicles are sometimes referred to as "cubes."

4

hand during the fight, and was wearing gloves. (T. 437-38).

Roman saw Petitioner leave his cube and duck down under a partition so he could not be seen. Petitioner went into the recreation area as the fight between Buckley and the victim began. (T. 438-39). Buckley grabbed the victim and stabbed him. (T. 439). Petitioner came from behind Buckley and lunged at the victim with a closed right fist, thrusting his hand back and forth. (T. 439-40, 447, 463). Petitioner was also wearing gloves. (T. 438, 440, 447).

At the time of the incident, Roman was serving a life sentence for robbery, possession of burglary tools, attempted robbery and criminal possession of a weapon. He wanted to be paroled. (T. 440-41, 456-57). Although Roman testified on cross-examination that he wanted the corrections system to have a favorable opinion of him, he stated that he did not believe cooperation would guarantee it. (T. 458-59). Roman testified that he was unaware of inmates's sentences being reduced as a result of cooperation. (T. 459). Roman also admitted that he told defense counsel that he was in the shower at the time of the incident and did not see what happened. (T. 443-44).

Wilfredo Galarza, another inmate, testified that he heard a commotion in the recreation room. He looked and saw two people fighting, and then saw Petitioner join the fight. (T. 392-96, 404-06). Galarza did not see any weapons. (T. 411). Galarza was serving a sentence for assault and seventh degree criminal possession of a controlled substance. (T. 399-401). Galarza also admitted on cross-examination that he wanted to be paroled, and that after he cooperated with the prosecution, he was

moved to a facility that is closer to his family.  (T. 407-08).  Galarza testified that he did not expect a sentence reduction for testifying.  (T. 408-09).

At approximately 7:00 p.m., the victim walked up to the front of the dormitory toward the guard station.  He told Corrections Officer Robert DiPrima, "I had fallen. I'm bleeding.  I'm dizzy."  (T. 369, 440).  The victim collapsed and later died.  (T. 369 414-15).  DiPrima saw a puncture wound on the victim's back, but there was no blood. (T. 370).

Corrections Officer Terry Johnston searched the dormitory for blood but found none.  (T. 473-75).  In the garbage can in the recreation room, Johnston found a toothbrush box containing two shanks, each measuring three and three quarter inches long.  (T. 478-80).  Johnston photographed the shanks and turned them over to New York State Police Investigator William Fitzmaurice.  (T. 488, 503-504).  No fingerprints were recovered from the shanks or the toothbrush box.  (T. 507-17, 522).

Medical Examiner Barbara C. Wolf conducted an autopsy on the victim.  (T. 332-33).  The victim had numerous injuries caused by an object with a sharp edge.  (T. 336).  There were fourteen superficial injuries on the victim's face, torso and left arm, and three superficial puncture wounds to the stomach and back.  (T. 336). The fatal injury was a stab wound to the back that penetrated the victim's heart.  (T. 336).  Dr. Wolf testified that this injury would not cause a significant amount of external bleeding.  (T. 343-45).   She also testified, to a reasonable degree of medical certainty, that the two weapons recovered from the recreation room garbage can would have

created injuries consistent with the victim's injuries.  (T. 342-44).

After the close of the People's case, defense counsel called two witnesses. First, Frederick Satterfield, an inmate assigned to a servant job in the kitchen, testified that he left the kitchen and returned to the dormitory at approximately 6:20 p.m.  (T. 540-44).  He saw Buckley and the victim fighting in the back of the recreation room, but he thought they were engaging in horseplay.  (T. 548-49).  On his way back to his cube, Satterfield testified that passed Petitioner.  (T. 550).  Satterfield was serving a sentence for arson and murder.  (T. 541-42).  He admitted on cross-examination that he told police that he did not see anything.  (T. 551-52).  The second witness, Leroy Allen, was Petitioner's cube-mate.  He testified that when he returned from the kitchen, Petitioner was on the top bunk in their cube listening to headphones.  (T. 561-62).  Allen took a shower and when he returned, Petitioner was still on the top bunk. He did not appear to have been in a fight, and was not excited or nervous.  (T. 564-66).  On cross-examination, Allen stated that did not know what Petitioner was doing while Allen was in the shower.  (T. 568).  Although Allen was the inmate arguing with the victim over the broom in the kitchen, he denied seeing Buckley and the victim exchange words in the kitchen.  (T. 567-68).

Petitioner testified in his own behalf.  He was serving a sentence for robbery, and shared a cube with Allen.  (T. 580-81, 596-98).  Petitioner testified that after he returned to his cube from the kitchen, he stayed there listening to music.  (T. 590-91). At some point, the corrections officers ordered the inmates into their cubes.  (T. 593).

Petitioner claimed he was unaware of what was happening at that point.  (T. 593).  He told the jury that he had no involvement in the assault, and that he had no intent to, or interest in, causing the victim serious physical injury.  (T. 593-94).  On cross-examination, Petitioner claimed that he would defend himself if he had to, but would not defend his friends.  (T. 601-02).  He also testified that he had never seen a metal shank in prison, only plastic ones.  (T. 602-03).  He testified that the first time he saw the victim after they left the kitchen was when the victim was being carried away after the incident.  (T. 607).  Petitioner and Buckley were each transferred to the Special Housing Unit.  (T. 594, 603).  Petitioner testified that he could communicate with Buckley from his cell by yelling.  (T. 605, 608-10).

In rebuttal, the People called Corrections Officer Michael Pullen. (T. 614-19). Pullen testified that Petitioner's and Buckley's cells in the Special Housing Unit were across from each other, and the inmates could communicate.  (T. 616-19).  He was unaware of any notes being sent by Petitioner to the kitchen in his food tray, and was unaware of Petitioner writing to anyone outside the prison to have them communicate with other inmates. (T. 620-22).

## 2.    **Standard of Review**

The standard of review in a habeas action depends upon whether the state court considered petitioner's constitutional claims "on the merits." The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C.

§ 2254 unless the state court ruling on the merits of a federal constitutional issue was either " 'contrary to ... clearly established Federal law' or 'involved an unreasonable application ... of clearly established Federal law.' " *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001)(*quoting* 28 U.S.C. § 2254(d)(1))(alterations in original), *cert. denied*, 534 U.S. 886 (2001).

"Clearly established federal law," as defined by the Supreme Court, refers to the Court's holdings as of the time of the relevant state court decision. *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000), *cert. denied,* 537 U.S. 909 (2002)). The statute further provides that the court may grant a writ of habeas corpus when a claim that was considered on the merits by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

A state court's decision is contrary to federal law if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams,* 529 U.S. at 413. A state court unreasonably applies clearly established federal law when the correct principle is identified, but the state court unreasonably applies that principle to the facts of the petitioner's case. *Lockyer,* 538 U.S. at 75, *Williams*, 529 U.S. at 413.

Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-13 (1995). When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.* The factual findings of the state court, however, were presumed to be correct absent circumstances listed in the statute, such as cases in which the factual finding was not fairly supported by the record. 28 U.S.C. § 2254(d) & (d)(8). The AEDPA requires the court to apply a more deferential standard, placing new restrictions on the power of federal courts to grant writs of habeas corpus to state inmates. *Williams,* 529 U.S. at 399.

In order to apply the AEDPA standard, the petitioner's claim must have been "adjudicated on the merits" in the State court proceedings. 28 U.S.C. § 2254(d)(1). Additionally, the AEDPA provides that a state court's fact findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. Id. § 2254(e)(1). If the State court has failed to adjudicate a claim "on the merits", the pre-AEDPA standard of review applies, and the court reviews both questions of law and mixed questions of law and fact de novo. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

## 3.   __Sufficiency of Evidence__

Petitioner claims that the evidence was legally insufficient to sustain his conviction for first degree manslaughter.  Specifically, Petitioner claims that there

was no evidence that he intended to cause serious physical injury.  He further argues that the "testimony of Roman and Galarza placing Petitioner in an altercation between Holden and Buckley was highly doubtful."  (Dkt. No. 42, Pet. at ¶12 (A)).  Respondent argues that the weight of the evidence claim is not cognizable, and the sufficiency claim is without merit.  (Dkt. No. 16-18).

Petitioner's claim that the testimony of Roman and Galarza was "doubtful" challenges the credibility of these witnesses and, thus, the weight that their testimony should have been given by the jury.  *See*, *e.g.*, *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006)(claim that witness testimony was incredible is not cognizable on federal habeas review because credibility determinations and how much weight to give testimony are within the province of the jury)(quoting *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).  "Weight of the evidence" claims derive from New York Criminal Procedure Law ("CPL") § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5); *People v. Bleakley*, 69 N.Y.2d 490, 508 N.E.2d 672, 515 N.Y.S.2d 761 (1987).

Since weight of the evidence claims are grounded in the state criminal procedure statute, they are not cognizable on habeas review.  *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or

treaty"); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (habeas corpus review not available to remedy alleged error of state law); *Hogan v. Livingston Corr. Fac.*, No. 05-CV-6440, 2007 WL 2907322, at *8 (W.D.N.Y. Oct. 3, 2007)("Since a 'weight of the evidence' claim is purely a matter of state law, it is not cognizable on habeas review."); *Stein v. Artus*, No. 04-CV-0439, 2007 WL 2778914, at *7 (N.D.N.Y. Sept. 19, 2007)(Lowe, M.J.)(same); *Welch v. Burge,* No. 03-CV-01423, 2007 WL 2028048, at *7 (N.D.N.Y. July 12, 2007)(Bianchini, M.J.).  Accordingly, to the extent that Petitioner challenges the weight of the evidence, that claim must be denied.

Petitioner's claim that the evidence was constitutionally insufficient is without merit. A petitioner who challenges a conviction on the sufficiency of the evidence bears a "very heavy burden." *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged. *See Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979).

This inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  A habeas petitioner claiming that there was insufficient evidence supporting the conviction is entitled to

relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson,* 443 U.S. at 324; *see also Schlup v. Delo*, 513 U.S. 298, 323 n. 38 (1995). *See Jackson,* 443 U.S. at 318-19; *In re Winship,* 397 U.S. 358, 364 (1970).

The reviewing court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor. *Jackson,* 443 U.S. at 319.[3] Finally, the federal court must look to state law to determine the elements of the crime for which the petitioner was convicted. *Ponnapula,* 297 F.3d at 179 (citing *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)), *cert denied* 528 U.S. 1170 (2000). A federal court may not grant habeas relief simply because of an independent belief that the state court applied federal law "erroneously" or "incorrectly." *Id*. (citing *Williams,* 529 U.S. at 411). Rather, the habeas court must determine that there is "[s]ome increment of incorrectness beyond error." *Id*. (quoting *Francis v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

Under New York law, the prosecutor had to prove that Petitioner, with the intent to cause serious physical injury to the victim, caused the victim's death. N.Y. PENAL LAW §125.20(1). "Serious physical injury" is injury that "creates a

---

[3] The *Jackson* standard is clearly established federal law as determined by the Supreme Court. *See Huber v. Schriver*, 140 F. Supp. 2d 265, 276 n. 5 (E.D.N.Y. 2001) (citing *Francis S.,* 221 F.3d at 114) (other citation omitted); *see also Santana v. Kuhlmann*, 232 F. Supp. 2d 154, 166-67 (S.D.N.Y. 2002).

substantial risk of death, or which causes death." *Id.* at 10.00(10). Intent may be inferred from the circumstances, including the actions of the accused, and it may be proven by direct or circumstantial evidence. *Stone v. Stinson*, 121 F. Supp. 2d 226, 247 (W.D.N.Y. 2000); *People v. Price*, 35 A.D.3d 1230, 1231, 825 N.Y.S.2d 868, 869 (4th Dep't 2006), *lv. denied* 8 N.Y.3d 926, 866 N.E.2d 462, 834 N.Y.S.2d 516 (2007). New York makes no distinction between "liability as a principal and criminal culpability as an accessory and the status for which the defendant is convicted has no bearing upon the theory of the prosecution." *Mercado v. Stinson*, 37 F. Supp. 2d 267, 278 (S.D.N.Y. 1999)(quoting *People v. Duncan*, 46 N.Y.2d 74, 79-80, 385 N.E.2d 572, 412 N.Y.S.2d 833, 837 (1978), *cert denied* 442 U.S. 910 (1982)).

In this case, the Appellate Division held that there was sufficient evidence to establish every element of first degree manslaughter, including that, as a principal or as Buckley's agent, Petitioner intended to cause serious physical injury and the resulting death. *Lewis*, 300 A.D.2d at 828, 752 N.Y.S.2d at 173-74. The court found:

> The record reveals that a mess hall dispute between [the victim] and Eddie Buckley continued when the two returned to their dormitory. According to one witness, the victim asked other inmates for a weapon, without success, and demanded that defendant, who was a friend of Buckley, remain in his cubicle. Notwithstanding the victim's directive, defendant exited his cubicle, crouched down low so as to escape detection, secreted to the recreation room and joined in the fight then in progress between Buckley and the victim.

The evidence further revealed that Buckley possessed a shank immediately before the altercation and was observed stabbing the victim. Defendant, however, was also observed repeatedly lunging at the victim, although no weapon was actually seen in his hands. Both men were observed wearing gloves. As a result of the fight, the victim suffered numerous superficial stab wounds and one fatal wound to the back which penetrated his heart and caused internal bleeding. A subsequent search of the dormitory produced two shanks which had been hidden in a small box and thrown in a garbage can near the fight. While no physical or testimonial evidence specifically connected these weapons with the victim's death, the pathologist who conducted the autopsy testified that the fatal injury was consistent with the use of such weapons.

Defendant took the stand in his own defense and denied any involvement in the incident, claiming instead to have remained in his cubicle during the fight. Viewing this evidence in a light most favorable to the People and indulging in all reasonable inferences in their favor, we find a valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury, namely, that defendant, as a principal and/or as Buckley's accomplice, intended to cause serious physical injury to the victim and that death resulted.

*Id.* Those findings are supported by the record evidence at trial (T. 332-47, 350-89, 391-420, 421-63, 472-526).

Petitioner claims that no witness saw him with a weapon, and that there was no testimony that Petitioner knew Buckley had a weapon or of a shared intent between himself and Buckley to injure the victim. (Dkt. No. 42, Mem. at 2-3). Under New York's accomplice liability theory, however, proof of the criminal relationship between the perpetrators is sufficient to establish guilt "notwithstanding the absence of proof as to which specific act of which individual was the immediate

15

cause of the victim's death." *People v. Dlugash*, 41 N.Y.2d 725, 732, 363 N.E.2d 1155, 1159, 395 N.Y.S.2d 419, 424 (1977). *See also People v. Williams*, 114 A.D.2d 385, 386, 493 N.Y.S.2d 903, 904 (2d Dep't 1985) (prosecution not required to prove defendant fired fatal shot where evidence was sufficient to prove that defendant acted in concert with another), *lv. denied*, 67 N.Y.2d 952, 494 N.E.2d 131, 502 N.Y.S.2d 1046 (1986). Further, the fact that there is no direct evidence of shared intent between Buckley and Petitioner does not mean that the prosecutor did not prove a shared intent, because intent may be inferred from the surrounding facts and circumstances. *Mejias v. Allard*, No. 03-CV-5195, 2006 WL 119033, at *16 (S.D.N.Y. Jan. 13, 2006).

In this case, the evidence established that Petitioner and Buckley shared a criminal relationship. Petitioner crouched down, secretly entering the recreation room, where he joined in the fight between Buckley and the victim, lunging repeatedly at him. The victim sustained several superficial stab wounds, along with the fatal wound to his back that pierced his heart. The jury could have reasonably inferred that Petitioner aided Buckley, and that they shared the same intent - to inflict serious physical injury on the victim, resulting in his death. *See, e.g., Skinner v. Duncan,* No. 01 Civ. 6656, 2003 WL 21386032, at *7 (S.D.N.Y. June 17, 2003)(evidence sufficient to sustain conviction for assault where petitioner shared a community of purpose with co-defendants in shooting the victim where the testimony conflicted regarding whether petitioner or his co-defendant fired the shot

16

but petitioner was seen holding the handgun); *People v. Kim*, 255 A.D.2d 337, 681
N.Y.S.2d 549 (2d Dep't 1998) (evidence that defendant was at the scene of a
gang-beating with a baseball bat in hand and victim testified that all gang members
participated in assault established a community of purpose even though victim's
testimony did not specifically inculpate defendant); *People v. Haire*, 96 A.D.2d
1110, 467 N.Y.S.2d 703 (3d Dep't 1983) (evidence that defendant and co-defendant
pursued victim brandishing knives and that co-defendant lunged at victim and
stabbed him supported finding that defendant intentionally aided co-defendant with
intent required for assault).

Under the facts and circumstances of this case, it was not irrational to have
found that each element of first degree manslaughter was proven beyond a
reasonable doubt.  The Appellate Division did not act contrary to or unreasonably
apply Supreme Court precedent in rejecting petitioner's claim, and the petition on
that ground is denied.

**4.    "Moral certainty" Circumstantial Evidence Jury Charge**

Petitioner next claims that the trial court erred when it failed to give the jury
the so-called "moral certainty" circumstantial evidence charge.  (Pet. Ground Two;
Mem. at pp. 8-13).  Respondent argues that this claim is unexhausted because
Petitioner never alerted the Appellate Division to the federal constitutional nature of
this claim, the claim is procedurally defaulted, in any event, it is meritless.  (Dkt.
No. 47, Resp't Mem. at 13-14, 18-20).

### A. Exhaustion

An application for a writ of habeas corpus may not be granted until the prisoner has exhausted all remedies available in state court unless there is an "absence of available state corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254 (b). To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively.  Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in the habeas corpus petition. Substantive exhaustion requires that a petitioner "fairly present" any constitutional claims to the highest state court in the same factual and legal context in which it appears in the habeas petition. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Fama v. Comm'r. of Corr. Servcs.*, 235 F.3d 804, 808 (2d Cir. 2000); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *Daye v. Atty. Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982), *cert. denied* 464 U.S. 1048 (1984); *Sweeney v. Superintendent, Watertown Corr. Fac.*, No. 06-CV-0663, 2007 WL 2176987, at *5 (E.D.N.Y. Jul. 27, 2007).

 The Second Circuit has stated that the ways in which a petitioner may fairly present a claim to the state court include "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d)

allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Daye*, 696 F.2d at 194.  The requirement that the state court have been given a reasonable opportunity to pass on the federal habeas claim is satisfied if the legal basis of the claim made in state court was the "substantial equivalent" of that of the habeas claim. *Picard,* 404 U.S. at 278; *Daye*, 696 F.2d at 189-90.  A claim is also "deemed" exhausted when no real avenue remains by which it could be raised. *See Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied* 514 U.S. 1054 (1995).

In this case, Petitioner's federal habeas claim is the substantial equivalent of the claim made in state court; that is, the failure to give the "moral certainty" jury charge misled the jury, calling their verdict into doubt.  Although Petitioner's state appellate brief contains no citation to federal cases or to the Constitution, it does cite to *People v. Crimmins*, 36 N.Y.2d 230, 237, 367 N.Y.S.213, 218, 326 N.E.2d 787, 791 (1975). (Dkt. No. 13, Exh. A, App. Br. at 21-27).  In the brief, Petitioner states that the "error requires reversal and a new trial." (Dkt. No. 13, Ex. A, App. Br. at 27).  The specific page of *People v. Crimmins* cited to by petitioner refers to whether an error is harmless under Federal and State constitutional law as well as distinguishing this from "non-constitutional errors." *Id.*

The resolution of exhaustion issue is unclear because the citation to *Crimmins* did not involve the specific issue raised by Petitioner in his habeas application, but merely referred to harmless constitutional error.  Generally, the fact that a jury

19

instruction was incorrect under state law is not a federal claim. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  An exception to this rule occurs when the state court must necessarily reject the federal claim in ruling on the state law claim. *See Jackson v. Edwards*, 404 F.3d 612, 618-21 (2d Cir. 2005)(petitioner fairly presented his claim when the legal standards for his federal and state claims were so similar that by presenting his state claim, he also presented his federal claim).  A "moral certainty" charge is required only under New York law, at the defendant's request, when the evidence is ***solely*** circumstantial. *People v. Daddona*, 81 N.Y.2d 990, 992, 615 N.E.2d 1014, 599 N.Y.S.2d 530 (1993) (whenever a case relies solely on circumstantial evidence, the jury should be instructed that it must find guilt to a "moral certainty").

Thus, if the citation to *Crimmins* was not sufficient to exhaust this claim, the allegation of improper jury instructions alone would not have been a citation in "terms so particular" as to bring to mind a right protected by the constitution and the pattern of facts was not well within the mainstream of constitutional litigation. However, this court finds in this close case, that the citation to *Crimmins* was sufficient, allowing the court to proceed to the merits of petitioner's claim.[4]

---

[4] It should be noted that if Petitioner had failed to exhaust his state court remedies, he would not have been able to return to state court, the issue would have to be "deemed" exhausted, and the court would have proceeded to an analysis of whether consideration of the issue would be barred due to Petitioner's procedural default. *See St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004); *Grey v. Hoke*, 933 F.2d 117, 120-121 (2d Cir. 1991)), *cert. denied*, 514 U.S. 1054 (1995).

A state prisoner who has procedurally defaulted on a federal claim in state court is

**B.  Jury Instruction**

Federal habeas corpus relief is unavailable for errors of state law.  *Estelle v.*

*McGuire*, 502 U.S. at 67-68 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). In

order for a federal habeas court to overturn a conviction resulting from a state trial

in which a properly requested instruction was not given, "it must be established not

merely that the instruction is undesirable, erroneous, or even 'universally

condemned,' but that it violated some right which was guaranteed to the defendant

by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146 (1973);

*accord, e.g., Davis v. Strack*, 270 F.3d 111, 123 (2d Cir.2001).

The failure to give a properly requested jury charge must have "so infected

the entire trial that the resulting conviction violates due process.'" *Naughten*, 414

U.S. at 147. A jury charge violates the federal constitution only if there is a

reasonable likelihood that the jury understood the instructions to allow them to

convict even if the government has not established every element of the charged

offense beyond a reasonable doubt. *Justice v. Hoke*, 45 F.3d 33, 34 (2d Cir. 1995).

Thus, a habeas petitioner carries a heavy burden in order to succeed on a claim that

---

entitled to federal habeas review of that claim only if he can show both cause for the default
and actual prejudice resulting from the alleged violation of federal law, *Coleman v.
Thompson*, 501 U.S. 722, 750 (1991), or establish that failure of the court to consider the
claim will result in a miscarriage of justice. *Id.* at 748.  A miscarriage of justice will have
occurred if the constitutional violation has "probably resulted in the conviction of one who is
actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

      Had the court proceeded to a procedural default analysis, the court would have
recommended dismissal of the claim because Petitioner had no cause for his failure to raise
the constitutional issue in his appellate brief.

a jury instruction was erroneously refused. *Norwood v. Artis*, 487 F. Supp. 2d 321, 333 (W.D.N.Y. 2007).

As stated above, a "moral certainty" circumstantial evidence charge is only required under New York law, at the defendant's request, when the evidence is solely circumstantial. *Norwood*, 487 F. Supp. 2d at 333 (citing *People v. Daddona*, 81 N.Y.2d 990, 992, 615 N.E.2d 1014, 599 N.Y.S.2d 530 (1993) ("Whenever a case relies wholly on circumstantial evidence to establish all elements of the charge, the jury should be instructed, in substance, that the evidence must establish guilt to a moral certainty.")).  If the charges against a defendant are also supported by direct evidence, the trial court need not give the "moral certainty" circumstantial evidence charge. *Daddona*, 81 N.Y.2d at 992, 599 N.Y.S.2d 530, 615 N.E.2d 1014 (citations omitted); *accord People v. Roldan*, 88 N.Y.2d 826, 827, 666 N.E.2d 553, 643 N.Y.S.2d 960, (N.Y.1996) (case against defendant involved direct evidence-namely eyewitness testimony which, if believed by the jury, established that defendant engaged in acts which directly proved that he was a lookout while the crime was being committed, along with conduct before and after the actual commission of the crime; defendant's accessorial guilt was not based solely on circumstantial evidence, and the moral certainty charge was not required).

In this case, the Appellate Division rejected this claim, finding that since the People's case consisted of both direct and circumstantial evidence of Petitioner's guilt, the "moral certainty" jury charge was not required.  *Lewis*, 300 A.D.2d at 829,

752 N.Y.S.2d at 174. As the Appellate Division noted, the direct evidence consisted of the eyewitness testimony of Galarza and Roman that Petitioner secreted himself into the recreation room and assisted Buckley in assaulting the victim, and that Petitioner was seen repeatedly lunging at the victim with gloved hands. *Id.* (*See* T. 393-95, 403-04, 419, 425-40, 447-48, 463). There was also direct evidence that Buckley had a homemade shank in his hand as he assaulted the victim. (T. 437).

The circumstantial evidence included the two shanks found hidden inside a toothbrush box in a trash can in the area of the fight, which, according to the pathologist, were consistent with the type of weapon that would have caused the victim's wounds. (T. 342-42, 477-83). Since **both** direct and circumstantial evidence existed, the trial court did not err under New York law when it failed to give the "moral certainty" jury charge.

Finally, viewing the jury charge as a whole, there does not exist a reasonable likelihood that the jury applied an incorrect standard when determining Petitioner's guilt. *Cupp*, 414 U.S. at 147; *Beverly v. Walker*, 118 F.3d 900, 902-03 (2d Cir. 1996), *cert. denied* 522 U.S. 883 (1997). The trial court instructed the jury that the People had the burden of proving Petitioner guilty beyond a reasonable doubt, and that even though Petitioner presented evidence, "the burden of proof remains on the People" and never shifts (T. 718). The court instructed the jury extensively on the meaning of reasonable doubt, including that the People had the burden of proving each element of each crime, including Petitioner's intent and state of mind. (T. 730-

36).  The court also instructed the jury that evidence may be direct or circumstantial, that direct evidence included what witnesses heard, saw or did, that, if believed, proved a fact in dispute. (*Id*. at 727).

Finally, the court used an example to explain circumstantial evidence, and instructed them that "facts which form the basis of an inference must be proven beyond a reasonable doubt and the inference to be drawn must be one that may be reasonably drawn and logically compelling."  (*Id*. at 729). Viewed as a whole, the trial court's charge was proper, and did not deprive Petitioner of a fair trial. This claim should be dismissed.

**5.**   **Admission of Shanks and Photographs**

Petitioner next alleges that the trial court violated his due process rights when it admitted the shanks and photographs thereof into evidence over defense counsel's objection.  (Pet. Ground Three, Mem. at 14-16).  Respondent argues that this claim is also unexhausted because Petitioner did not alert the state court to the federal nature of the claim, is procedurally defaulted and in any event, is meritless.  (Dkt. No. 27, Resp't Mem. at 20-22).

There is no citation to federal cases or to the Constitution in Petitioner's appellate brief.  This claim was analyzed strictly under New York evidentiary law, and counsel did not cite to any commonly recognized federal constitutional errors, such as the denial of due process.  (Dkt. No. 13, App. Br. at 27-30).  Although the Petitioner cited *People v. Crimmins*, the section of the case that he cited specifically

24

dealt with the State rule, and stated that "[o]r State rule to determine harmlessness of nonconstitutional error is not the same as the Federal rule." *People v. Crimmins*, 36 N.Y.2d at 241-42 (cited in Petitioner's App. Br. at 29).  Because errors in the admission of evidence do not generally constitute a basis for the issuance of a writ of habeas corpus,[5] this claim would not call to mind a right protected by the federal constitution or cite a pattern of facts that is well within the mainstream of constitutional litigation.

Accordingly, it does not appear that the federal nature of this claim was fairly presented to the state courts.  Thus, Petitioner's evidentiary claim is not exhausted. As noted above, if the claim is unexhausted, the court must determine whether Petitioner may now return to State court to exhaust his claim.  As stated above, if petitioner has not exhausted his state court remedies, but no longer has remedies available in state court with regard to these claims they are "deemed" exhausted but are also procedurally defaulted. *St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004); *Grey v. Hoke*, 933 F.2d 117, 120-121 (2d Cir. 1991)), *cert. denied*, 514 U.S. 1054 (1995).

A state prisoner who has procedurally defaulted on a federal claim in state court is entitled to federal habeas review of that claim only if he can show both cause for the default and actual prejudice resulting from the alleged violation of

---

[5] *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988)(stating that "[i]t is true that erroneous evidentiary rulings do not automatically rise to the level of constitutional error").

federal law, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), or establish that failure of the court to consider the claim will result in a miscarriage of justice. *Id.* at 748. A miscarriage of justice will have occurred if the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

In this case, Petitioner has not shown any cause for his failure to assert this claim in a federal constitutional context. A review of Petitioner's State court appellate brief shows that counsel was well aware of the difference between constitutional and non-constitutional claims, and cited the federal constitution when he believed that it was appropriate for the claim. The court notes that in Petitioner's "Point IV," Petitioner's counsel starts the discussion by stating that Petitioner's right to counsel under **both** the Federal and State Constitutions was violated. Petitioner's App. Br. at 30. A review of Petitioner's supplemental *pro se* brief also shows that he was well aware of the ability to cite the Federal Constitution in his claims. Thus, Petitioner can cite no "cause" for his failure to exhaust the evidentiary ruling claim.

A petitioner must show **both** cause **and** prejudice **or** a miscarriage of justice in order for the federal habeas court to review a procedurally defaulted claim. *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). Since this petitioner has not shown cause, the court need not determine the issue of prejudice. In addition, this court has already determined that the evidence was constitutionally sufficient to

26

convict petitioner of the offense.  Petitioner has not shown that there would be a miscarriage of justice or that he is actually innocent.  Thus, the court may not proceed to a discussion of the merits of the evidentiary issue, and this claim may be dismissed on procedural grounds.

## 6.    Violation of Right to Counsel

Petitioner alleges that the trial court violated his right to counsel when it denied his *pro se* motion for new counsel without a hearing.  (Dkt. No. 42, Pet. at Ground Four, Mem. at 16-18).  Specifically, Petitioner alleges that he lost faith in counsel after learning that counsel erroneously advised him that the decision regarding whether he testified at grand jury was for counsel to make.  Petitioner argues that this action by counsel deprived Petitioner of the right to testify before the grand jury, and thereby poisoned the attorney-client relationship.  (*Id*.).

The Appellate Division did not directly address this issue.  It did, however, state: "We have considered the other contentions raised by defendant . . . and find them to be unpersuasive."  *Lewis*, 300 A.D.2d at 829, 752 N.Y.S.2d at 174.  The state court thus disposed of this claim, even though it did not provide reasoning for its denial, and reduced its disposition to judgment on the merits under §2254(d). The Appellate Division's decision is thus entitled to AEDPA deference.  *See Jimenez,* 458 F.3d at 145; *Sellan*, 261 F.3d at 312; *Fama,* 235 F.3d at 810-11.

The right to counsel in criminal prosecutions is guaranteed by the Sixth Amendment, applicable to the states through the Fourteenth Amendment. *United*

*States v. Gonzalez-Lopez,* 126 S. Ct. 2557, 2561 (2006); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989); *Lainfiesta v. Artuz*, 253 F.3d 151, 154 (2d Cir. 2001)(quoting U.S. Const. amend. VI and *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963)). The Supreme Court has held that "an element of this right is the right of a defendant who does ***not*** require appointed counsel to choose who will represent him." *Gonzalez-Lopez,* 126 S. Ct. at 2561 (citing *Wheat v. United States*, 486 U.S. 153,159 (1988))(emphasis added). While an indigent defendant has no Sixth Amendment right to have a particular attorney represent him, he does have the right to effective representation by appointed counsel, which can be jeopardized if the "attorney-client relationship is bad enough." *Stephens v. Costello*, 55 F. Supp. 2d 163, 169 (W.D.N.Y. 1999) (quoting *United States v. Graham*, 91 F.3d 213, 221 (C.A.D.C. 1996), *cert. denied* 519 U.S. 1136 (1997)).

The Sixth Amendment does not, however, guarantee a "meaningful relationship" between a defendant and counsel. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). Trial judges are given broad discretion when determining whether adequate grounds exist to substitute counsel. *Id.* (citing *McKee v. Harris*, 649 F.2d 927, 933 (2d Cir. 1981)(internal citations omitted). A defendant must file a timely motion for new counsel, and must show good cause for the request for new counsel, such as "a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." *McKee*, 649 F.2d at 931. *See*

*Dowtin v. Cohen*, No. 00-CV-323, 2005 WL 697981, at *21 (E.D.N.Y. Mar. 25, 2005).

In this case, Petitioner's *pro se* motion to substitute counsel was timely because it was filed on January 18, 2001, four months before his trial began. (Dkt. No. 12, Exh. A, Appellant's Appendix, at A-6, ¶¶ 5-7). In the motion, Petitioner alleged that he filed a notice of intent to testify before the grand jury on the advice of the law library clerk at Coxsackie Correctional Facility. (*Id.* at A-7, ¶ 5). When counsel learned of his request to testify, counsel visited Petitioner. Petitioner alleged that counsel informed him that he would not let Petitioner testify. Petitioner believed that decision was counsel's to make instead of his own. (*Id.* at A7, ¶6). Finally, Petitioner alleged that counsel sent a letter to the grand jury advising it to disregard his notice of intent to testify. (*Id.* at A7, ¶7). Petitioner's motion for new counsel was denied by the trial court on May 1, 2001 before the trial began. (T. 14-15).

There was nothing about these allegations that made the claim substantial enough to warrant a hearing. In fact, the letter to which Petitioner refers, dated August 7, 2000, refutes Petitioner's claim that counsel unilaterally decided that Petitioner would not testify before the grand jury. In the letter, counsel explained that, "based upon the information that I have received, I see no need for Mr. Lewis to testify and have advised him of that. As a consequence, Mr. Lewis likewise feels no need to testify, and withdraws his earlier request." (*Id.* at A12). Moreover, the

court did not decide the motion until the day Petitioner's trial began.  At that point, the court was aware that counsel had filed motions, including a motion to preclude admission into evidence of the shanks and a motion to suppress Petitioner's statements to police, litigated on November 2, 2000.  (*See id.* at A20-24). The court also knew that counsel discussed plea offers with Petitioner, and had prepared for trial. (T. 15-17).  There was no indication that counsel and Petitioner were unable to communicate, or that there was a conflict of interest that jeopardized Petitioner's right to counsel. (*See id.* at A14-16).

The trial court explained its reasons for denying Petitioner's motion for new counsel in a Decision dated June 15, 2001 in which the court denied Petitioner's *pro se* motion to set aside the verdict under CPL 330.30. (Dkt. No. 13, Exh. B at A28-41, 32-33).  The trial judge found that Petitioner's motion "raised no significant question with regard to the effectiveness of the representation being provided by defendant's assigned counsel . . . an experienced criminal defense attorney and former Greene County District Attorney."  (*Id*. at A32-33).  On the record before this Court, the trial court's refusal to appoint new counsel did not constitute a federal constitutional violation. The Appellate Division's rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent, and this claim should be denied.

To the extent that Petitioner's claim is that he was denied his right to testify before the grand jury by counsel's actions, that claim is not cognizable.  In New

York, a defendant's right to testify before the grand jury is not a federal

constitutional right but, rather is a statutorily created right under CPL§190.50(5)(a);

*People v. Smith*, 87 N.Y.2d 715, 724, 665 N.E.2d 138, 642 N.Y.S.2d 568 (1996).

Accordingly, petitioner's claim that he was denied the right to testify before the

grand jury is not cognizable on federal habeas review. 28 U.S.C. §2254 (a)

(permitting federal habeas review only where a petitioner alleged that he is in state

custody in violation of "the Constitution or a federal law or treaty"); *Lopez v. Riley*,

865 F.2d 30, 32 (2d Cir. 1989); *Welch v. Artuz*, 04-CV-205 S, 2007 WL 949652,

at*18 (W.D.N.Y. Mar. 29, 2007); *Lucius v. Filion*, 431 F. Supp 2d. 343, 346

(W.D.N.Y. May 23, 2006); *Staley v. Greiner*, No. 01 Civ. 6165, 2003 WL 470568,

at *12 (S.D.N.Y. Feb. 6, 2003).

Further, petitioner's subsequent conviction by a jury (T. 902-06) cured any

arguable defects in the indictment process "because the trial conviction establishes

probable cause to indict and also proof of guilt beyond a reasonable doubt."

*Montalvo v. Annetts*, 02 Civ. 1056, 2003 WL 22962504, at *17 (S.D.N.Y. Dec. 17,

2003).  *See United States v. Mechanik,* 475 U.S. 66, 69 (1986) ("[t]he petit jury's

subsequent guilty verdict means not only that there was probable cause to believe

that the defendants were guilty as charged, but also that they are in fact guilty as

charged beyond a reasonable doubt."); *Davis v. Mantello*, 42 Fed. Appx. 488,

490-91 (2d Cir. 2002) ("Claims of deficiencies in state grand jury proceedings are

not cognizable in a habeas corpus proceeding in federal court." ), *cert. denied* , 538

U.S. 986 (2003); *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir.1989) ( "If federal grand

jury rights are not cognizable on direct appeal where rendered harmless by a petit

jury, similar claims concerning a state grand jury proceeding are a fortiori

foreclosed in a collateral attack brought in federal court." ); *Klosin v. Conway*, No.

02-CV-0473, 2007 WL 2255119 at *6 (W.D.N.Y. Aug. 7, 2007) (claim of

insufficiency of the evidence before the grand jury was cured by petitioner's

subsequent conviction after trial and the claim was not a basis for federal habeas

relief).   Thus, to the extent that the claim may be read as one challenging

Petitioner's failure to testify before the Grand Jury, it would be denied.

## 7.    Effective Assistance of Trial Counsel

Petitioner claims in Grounds Five and Eight of his petition that counsel was

ineffective for failing to call Buckley as a witness.  (Pet. Grounds V and VIII, Mem.

at 18-20, Mem. POINT VIII).  He further argues in Ground Six that counsel's

decision not to call Buckley, affirmed by the trial court, denied him the right of

compulsory process (Mem. at 20-21).  Finally, Petitioner argues in Ground Nine

that counsel was ineffective for not alerting the trial court that the prosecutor failed

to disclose exculpatory evidence in the form of the grand jury testimony of Shawn

Thompson. (Mem. at POINT IX).  Respondent argues that Ground Nine is untimely,

and that each of these claims are without merit.  (Resp't. Mem. at 12-13, 22-29).

Petitioner raised these claims in a motion to vacate his conviction, filed in

County Court on or about April 18, 2006, after he filed this petition for habeas

corpus and during the time that this court granted him a stay.  (Dkt. No. 38, 39).

The state trial court denied the motion to vacate.  The court found that trial

counsel's decision not to call Buckley as a witness was a strategic one, and that, in

light of Buckley's refusal to testify for either the prosecution or the defense, counsel

was not ineffective for deciding not to call him as a witness.  (Dkt. No. 48, Exh. H,

Decision, at 1-2).  The court also found that there was no *Brady* violation, and,

accordingly, counsel was not ineffective for failing to alert the court to the alleged

*Brady* violation. (*Id*. at 2).  The trial court's decision, which is entitled to AEDPA

deference, was not contrary to or an unreasonable application of clearly established

Supreme Court precedent.

A claim of ineffective assistance of counsel is sustainable only if counsel's

representation fell below an objective standard of reasonableness, and there is a

reasonable probability that, absent counsel's errors, the result of the proceeding

would have been different. *Strickland v. Washington*, 466 U.S. 668, 686 (1984);

*Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912

(1993). In applying this test, a reviewing court must be "highly deferential" and

presume that counsel's conduct falls within the range of reasonable performance.

*Strickland*, 466 U.S. at 689.  Any counsel errors must be considered in the

aggregate, rather than in isolation. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir.

2001). The failure to make meritless arguments or objections cannot constitute

ineffective assistance. *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999),

*cert. denied*, 531 U.S. 811 (2000). There is a strong presumption that counsel rendered adequate assistance as courts give high deference to counsel, and Petitioner "must overcome the presumption that the challenged action 'might be considered sound trial strategy.'" *Gatto v. Hoke*, 809 F. Supp. 1030, 1038 (E.D.N.Y. 1992) (quoting *Strickland v. Washington*, 466 U.S. at 689), *aff'd mem.,* 986 F.2d 500 (2d Cir. 1992); *see also Jackson v. Conway*, 448 F. Supp. 2d 484, 492 (W.D.N.Y. 2006).

A review of the record in this case indicates that Petitioner's trial counsel properly represented him in all respects. Counsel's theory of the case was that Petitioner was not involved in the incident, and that if he was, he and Buckley did not share the same intent; that there was no evidence of a plan or agreement between Petitioner and Buckley to seriously injure or kill the victim; no physical evidence linked Petitioner to the crime; and Galarza's and Roman's testimony was "worthless." (T. 666-91).

In support of that defense, and Petitioner's own testimony, counsel presented two witnesses, each of whom implied Petitioner was not involved in the assault. Frederick Satterfield testified that he saw Buckley and the victim "tussling" in the back of the recreation room, but that he saw no weapons and thought that the two were "horseplaying." (T. 548-51). Satterfield testified that as he left the recreation room on the way to his cube, he passed Petitioner. (T. 550). Leroy Allen, Petitioner's cube-mate, testified that after he finished his 6:00 a.m. to 6:00 p.m. shift

in the kitchen, he returned to his cube and saw Petitioner, who got onto the top bunk and was "listening to headphones." (T. 561-64). Allen took a shower, and when he returned, Petitioner was still there. (T. 564-66). Counsel also filed appropriate motions, raised appropriate objections and legal arguments, and vigorously cross-examined witnesses. (T. 4-20, 291-92, 313-27, 345-37, 381-89, 399-416, 420, 443-61, 491-98, 518-23). Counsel's representation resulted in acquittal of second degree murder, the most serious charge of the indictment. (T. 743-44).

### A. Failure to call Buckley as a witness:

Petitioner nonetheless claims that counsel was ineffective for failing to call Buckley as a witness, and that counsel's failure to do so denied him the right of compulsory process. The decision of whether to call any witnesses on behalf of a defendant, and which witnesses to call or not to call, is a tactical decision which ordinarily does not constitute the basis for a claim of ineffective assistance of counsel. *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002), *cert. denied* 538 U.S. 1021 (2003); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987), *cert. denied* 484 U.S. 958 (1987); *Hogan,* 2007 WL 2907322, at *4. That is so even if the potential witnesses might offer exculpatory evidence. *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997), *cert. denied* 522 U.S. 846 (1997).

In this case, defense counsel made a strategic decision not to call Buckley as a witness. In an *ex parte* conference between counsel and the trial court, counsel explained that he discussed whether to call Buckley as a witness at length with

Petitioner. (T. 573).  Counsel stated that it was his recommendation, "and it is my decision, as trial counsel" that Buckley not testify.  (*Id.*).  Counsel explained that he believed Buckley would fill in the "missing pieces" in the prosecution's case and that his testimony would be more harmful than helpful to Petitioner. (*Id.* at 574).  Counsel informed the court that Petitioner planned to testify regardless of whether Buckley testified, and that he could tell the jury where he was and what he was doing without Buckley.  (*Id.* at 574).

The record shows that Buckley's testimony would have corroborated much of the prosecution's witnesses.  Although Buckley told police and the grand jury that Petitioner started to join the fight but backed off when he saw the shanks, that testimony would have established that Petitioner was in the recreation room during the assault and was involved in it.  (*See* Dkt. No. 42, grand jury testimony of Buckley, at p. 61 and Buckley's statement to police).  That testimony would have contradicted Petitioner's testimony, and that of his other witnesses, that he was not in the recreation room but was instead in his cube throughout the incident.  Counsel was not ineffective for not calling Buckley to testify.  *See Brown v. Brown*, No. 05 Civ. 10434, 2006 WL 3405480, at *17 (S.D.N.Y. Nov. 27, 2006)(counsel's strategic decision not to call a witness supported by the fact that the witness had an extensive criminal record and because the witness was involved in the crime at issue, which may have weighed negatively on his credibility); *Llanos v. Goord*, 06 Civ. 0261, 2006 WL 1981749 at *19 (S.D.N.Y. July 14, 2006) (counsel not ineffective for

failing to call witness he felt was not truthful and whose testimony he felt would be harmful).

Moreover, even if counsel had tried to call Buckley as a witness, it appears that he would not have been successful.  After defense counsel rested, the prosecutor attempted to call Buckley as a rebuttal witness.  (T. 612-13).  Buckley refused to testify, asserting his Fifth Amendment right against self-incrimination because, although he pleaded guilty for his role in this case, he was not yet sentenced.  (*Id*. at 623-25, 627-29).  The prosecutor expected Buckley to testify consistently with his grand jury and suppression hearing testimony, and his statement to police, which all implicated Petitioner.  (T. 641).  The court was concerned that if Buckley invoked the Fifth Amendment without basis in order to avoid testifying, he could face contempt charges.  (T. 638, 642).  Since Buckley invoked the Fifth Amendment, the court did not permit the prosecutor to call him to the witness stand to so state.  (T. 662).

Under these circumstances, counsel could not be ineffective for failing to call a witness to testify where the witness refused to do so. *See*, *e.g. Zanghi v. McGinnis,* No. 99-CV-6293, 2005 WL 3241857, at *15 (W.D.N.Y. Nov. 30, 2005)("There was nothing remotely unreasonable about [counsel's] decision not to call a witness who already intended to invoke the Fifth Amendment.");  *Mesterino v. United States*, No. 96 CIV. 2114, 1997 WL 528047, at *6 (S.D.N.Y. Aug. 27, 1997)(counsel's decision not to call a witness he learned was uncooperative and planned to invoke the Fifth

Amendment if called to testify was reasonable trial strategy).

Petitioner's related claim presented in Ground Six of his petition, that counsel's decision not to call Buckley, which was supported by the trial court, was a denial of his right to compulsory process under the Sixth Amendment, also does not warrant relief. Petitioner has the fundamental constitutional right to present witnesses to support a defense against criminal charges under the Sixth and Fourteenth Amendments. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Brown v. McKinney*, 358 F. Supp. 2d 161, 170 (E.D.N.Y. 2005). That right is denied when the state "arbitrarily denies a defendant the opportunity to put on the stand a witness whose testimony would be relevant and material to his defense." *Singleton v. Lefkowitz*, 583 F.2d 618, 623 (2d. Cir. 1978)(citing *Washington v. Texas*, 388 U.S. 14, 23 (1967)), *cert denied* 440 U.S. 929 (1979). But here, Petitioner was not arbitrarily denied the right to call Buckley as a witness by the trial court or by counsel. Instead, Buckley refused to testify. Accordingly, this claim should be dismissed.

## B. Alleged Brady Violation

Petitioner also claims that counsel was ineffective for not alerting the court to an alleged Brady violation related to grand jury testimony given by Shawn Thompson. Respondent argues that this claim is untimely and without merit. (Resp't Mem. at 12-13).

### i. Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on federal *habeas* petitions that begins to run from the latest of several events, including the date on which the challenged state court conviction becomes final, the date upon which an impediment to filing created by State action in violation of the constitution or laws of the United States is lifted, the date on which the asserted constitutional right was newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review, and the date on which the factual predicate of the claim could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(A) - (D).

The Second Circuit has held that for purposes of 28 U.S.C. § 2244, a state conviction becomes "final" when the time to seek certiorari to the United States Supreme Court has expired, which is ninety days after the date direct review of the case has been completed by the highest court in the state. *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001), *cert. denied* 534 U.S. 924 (2001); *Williams v. Breslin*, No. 03 CIV. 1848, 2004 WL 242447, at *1 (S.D.N.Y. Feb. 11, 2004). The one-year limitation period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). "This tolling provision 'excludes time during which properly filed state relief applications are pending' but it does not restart the statute of limitations clock." *Breslin*, 2004 WL 242447, at *2

(*quoting Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000), *cert. denied*, 531 U.S. 840 (2000)).

Petitioner's request for leave to appeal his conviction to the New York Court of Appeals was denied on March 4, 2003. His conviction became final for habeas purposes ninety days later on June 2, 2003. *See* 28 U.S.C. § 2244(d)(1)(A); N.Y. CRIM. PROC. LAW § 460.10(5). Petitioner had one year from that date, or until June 2, 2004, to file a federal *habeas* petition. Petitioner filed his amended petition on February 6, 2004. In the amended petition, Petitioner raised a number of claims, including that counsel was ineffective for failing to call Buckley as a witness. (Dkt. No. 7, Ground Five). This petition was timely filed.

On August 23, 2005, Petitioner requested a stay of his habeas petition so that he could "develop the state record to include all the factual components to support the claim that trial counsel was ineffective for failure to produce exculpatory testimony from an available witness at my trial." (*See* Dkt. No. 24). On April 6, 2006, Petitioner's request was granted, and he was ordered to commence post-conviction proceedings within thirty days in the state courts. (See Dkt No. 27, Decision and Order, Kahn, J.). Petitioner complied with the order, and filed a CPL 440 motion in Greene County Court on April 18, 2006. (Dkt. No. 38). The motion was denied on May 12, 2006, and leave to appeal was denied on August 23, 2006. (Dkt. No. 50, Exhs. H, I).

On November 20, 2006, attorney Andrea Hirsch was admitted *pro hac vice* to

represent Petitioner. (*See* Dkt. No. 35). On December 21, 2006, counsel filed a motion to amend the petition to include the newly exhausted ineffectiveness claims raised in Petitioner's CPL 440 motion, including the one at issue here. (*See* Dkt. No. 38). Respondent did not respond to this motion. (See Dkt. No. 41 at 2). This Court granted Petitioner's motion to amend his petition on April 19, 2007, finding no "undue delay, bad faith or dilatory motive" by Petitioner, but explicitly stated that it "makes no ruling whatsoever on the merits of the claims set forth in the second amended petition." (*Id*.). Respondent does not now raise the statute of limitations as an affirmative defense in his Answer, but instead challenges the timeliness of only Ground Nine in his Memorandum of Law. (*See* Dkt. No. 48; 47).

Petitioner's second amended petition, in which he includes the claim at issue, was not filed until May 1, 2007, after the one year time period in which to seek habeas relief expired. 28 U.S.C. §2244 (d)(A). Had Petitioner filed a post-conviction application prior to June 2, 2004, while the opportunity to seek habeas relief still existed, the pending application would have tolled the statute of limitations. 28 U.S.C. § 2244(d)(2). But Petitioner is not entitled to tolling under Section 2244(d)(2) because he did not file his post-conviction motion until April 18, 2006, almost two years after the deadline to file the *habeas* petition had expired. Therefore, the filing of his post-conviction application did not restart the statute of limitations clock. *Breslin*, 2004 WL 242447, at *2; *Davis v. McCoy*, 00 CIV. 1681, 2000 WL 973752, at *2 (S.D.N.Y. July 14, 2000).

Since Petitioner's second amended petition was not filed until May 1, 2007, after the one-year statute of limitations had run, he is required to show that his amended petition relates back to the claims in the timely filed petition within the meaning of Rule 15 of the Federal Rules of Civil Procedure. *Mayle v. Felix*, 545 U.S. 644, 664 (2005); *Fama*, 235 F.3d at 816; *Valerio v. Phillips*, No. 02-CV-903, 2007 WL 4191817, at *4 (W.D.N.Y. Nov. 21, 2007). In order for relation back to exist, the original and amended petitions must "state claims that are tied to a common core of operative facts" (*Mayle*, 545 U.S. at 664) and must arise from "the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(1)(B)[6]. If the amended petition asserts a new ground for relief that is supported by facts that are different "in time and type" from those in the original pleading, the amended petition does not relate back. *Mayle*, 545 U.S. at 649-50, 657.

As respondent apparently concedes, eight out of nine of the claims in the second amended petition relate back to those set forth in the February 6, 2004 petition. The first seven of the claims essentially repeat the claims initially asserted by Petitioner. (See Dkt. No. 7, Grounds One - Seven; Dkt. No. 42, Grounds One - Seven). The eighth claim, that counsel was ineffective for failing to call Buckley as

---

[6] The court notes that the section of Rule 15 originally governing relation back was 15(c)(2). The amendments to the Federal Rules of Civil Procedure have renumbered the sections of Rule 15, and Rule 15(c)(2) no longer discusses the concept of "relation back." Rule 15(c)(2) is now Rule 15(c)(1)(B). The substance of this section is the same with minor changes in the wording.

42

a witness, re-states and, to some extent, clarifies Ground Five of the February
petition. (*Id.*). However, the claim that counsel was ineffective for not notifying
the trial court that the prosecutor failed to disclose exculpatory evidence in the form
of Thompson's grand jury testimony, is wholly different from the originally pleaded
claims. This claim involves different facts, circumstances, and people than any of
the claims asserted in the February 2004 petition. *See Mayle*, 545 U.S. at 664. In
fact,  there is no reference to Thompson or to his grand jury testimony at all in the
February 2004 petition.

The *Brady*-based counsel claim and the originally pleaded ineffectiveness
claim in the February 2004 petition regarding the failure to call Buckley as a
witness are both based upon the failure of counsel to do something at trial.  The
Supreme Court, however, has rejected the notion that 'the trial itself is the
'transaction' or 'occurrence' that counts in determining whether a common core of
operative facts exists." *Porter v. Griener*, No. 00-CV-6047, 2005 WL 3344828, at
*10 (E.D.N.Y. Nov. 18, 2005)(quoting *Mayle*, 545 U.S. at 659).   Since this claim is
wholly different from those in the 2004 petition, it cannot be deemed to relate back,
and this claim is untimely.

A court may, in certain circumstances, excuse a petitioner's delay in filing a
timely motion under the doctrine of equitable tolling. *Smith v. McGinnis*, 208 F.3d
13, 17 (2d Cir. 1996), *cert. denied* 531 U.S. 840 (2000); *Bellamy v. Fisher*, No. 05
CIV. 2840, 2006 WL 2051038, at *4 (S.D.N.Y. July 24, 2006).  The doctrine should

be used only in rare circumstances. *Lawrence v. Florida*, 127 S. Ct. 1079, 1085 (2007).  For equitable tolling to apply, petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Lawrence,* 127 S. Ct. at 1085 (*quoting Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007).  A petitioner claiming extraordinary circumstances must support that claim with evidence and not simply with "personal conclusions or assessments." *Bellamy*, 2007 WL 2051038,  at *5 (*citing Mendez v. Artuz*, No. 99 CIV. 2472, 2000 WL 991336, at *2 (S.D.N.Y. July 18, 2000) (holding that conclusory allegations do not meet the high burden required to justify tolling).  A petitioner must also show that he was unable to pursue his legal rights during the entire period that he seeks to toll.  *Barbosa v. United States*, No. 01 CIV. 7522, 2002 WL 869553, at *5 (S.D.N.Y. May 3, 2002).

Petitioner in this case does not directly seek equitable tolling, and has failed to demonstrate any extraordinary circumstances that prevented him from exhausting this claim prior to the expiration of the limitations period.  He does, however, argue that since he is serving a lengthy prison sentence, this Court should reach the merits of his claim. In support of that argument, counsel asserts that amendments to Rule 15, effective December 1, 2007 "absent contrary Congressional action," will permit amendment at any time by leave of court.  (Dkt. No. 51, at 2). The provision to which counsel refers, that the court "should freely give leave when justice so

44

requires," is found in Rule 15(a)(2), and applies where a party amends its pleading with the opposing party's consent or the court's leave.  FED. R. CIV. P. 15(a)(2).  But Rule 15(a)(2) does not relieve Petitioner of the obligation to show that the amendments relate back to those in the original pleading in order to be timely for habeas purposes. Fed. R. Civ. P. 15(c).

Because this claim does not relate back to those in his timely filed petition, Ground Nine of the petition is untimely and should be dismissed. Even if this claim were timely, it would still have to be dismissed.

### ii.  The Merits

The trial court rejected this claim, finding that Thompson's grand jury testimony was not exculpatory and that defense counsel had knowledge of it in advance of trial.  (Dkt. No. 48, Exh. H, Decision, Lalor, J.).  Leave to appeal was denied. (Dkt. No. 48, Exh. I). Since this claim was presented to the state courts and a decision was rendered, the deferential AEDPA standard of review applies.

A habeas petitioner may be entitled to relief if he shows that the government violated his right to due process by failing to turn over material exculpatory evidence before trial.  *Strickler v. Greene*, 527 U.S. 263 (1999); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).  To demonstrate a *Brady* violation, Petitioner must show that: (1) the evidence was favorable; (2) the evidence was suppressed by the prosecutor; and (3) prejudice

45

resulted.  *Strickler*, 527 U.S. at 281-81.  Evidence is favorable to the defense when

it is exculpatory (relating to the factual innocence of the defendant) or when it

serves to impeach the government's witnesses.  *Id.* at 280; *U.S. v. Bagley*, 473 U.S.

667, 676 (1985).  Impeachment evidence may be material where the witness

supplied the only evidence that linked a defendant to the crime at issue, or where the

witness supplied the only support for an essential element of the crime.  *U.S. v.*

*Avellino*, 136 F.3d 249, 256-57 (2d Cir. 1998).  "Evidence is not 'suppressed' if the

defendant either knew, or should have known, of the essential facts permitting him

to take advantage of any exculpatory evidence." *Leka v. Portuondo*, 257 F.3d 89,

100 (2d Cir. 2001)(quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d

Cir.1982), *cert. denied* 459 U.S. 1174 (1983) (citations omitted)).

    In this case, the trial court summarized Thompson's grand jury testimony and

ruled it was not exculpatory:

> Thompson's grand jury testimony was that at 6:30 p.m. on June 18,
> 2000 in Dorm 1 at Coxsackie Correctional Facility he was in the front
> of the dorm near his cubicle (Cube 2) watching TV, when Holden came
> in from work, went to his cubicle (Cube 8), then to the bathroom, then
> came and sat down.  Holden told Thompson he had had an argument
> with Buckley in the mess hall that day, and asked if Thompson had a
> weapon he could have.  Thompson responded he did not.  Buckley
> came into the dorm and told Holden he wanted to talk to him in the rear
> recreational area.  Buckley got up and followed Holden to the
> recreational area, and Thompson followed.  In the rear recreational
> area, Thompson saw Buckley pull from his pocket what appeared to be
> an ice pick, and lunge at but not strike Holden.  Thompson immediately

46

turned and returned to the front of the dorm. Thompson did not see
anyone actually stab Holden.  According to Thompson, a few minutes
later, Holden came to the front of the dorm "holding his side," spoke to
a correctional officer, and collapsed.  Asked whether defendant Lewis
was in the area of the fight between Holden and Buckley, Thompson
responded, "Not that I know of." (Grand Jury Minutes, August 2, 2000,
Part 1, p. 71).

(*Id.* at 1-2).  Thompson's testimony did not relate to the factual innocence of

Petitioner, because as soon as the incident began, Thompson left the recreational

area and, as the trial court noted, he did not see the entire fight and did not see

someone other than Petitioner "inflict any blows on the victim."  (*Id*).  The

witnesses who ***did*** see the fight, Galarza and Roman, testified that Buckley and

Petitioner were involved in it and that Petitioner made lunging motions toward the

victim with a closed fist.  (T. 394-95, 431-32, 439-40, 447-48, 463).

Moreover, as the trial court also found, the information was known to defense

counsel well in advance of trial.  Thompson testified at grand jury on August 2,

2000.  (Dkt. No. 48, Exh. H, at 2).  On August 7, 2000, just five days later, trial

counsel interviewed Thompson at Coxsackie Correctional Facility.  (Dkt. No. 42,

Exh. B, counsel's handwritten notes). Counsel's notes of that interview reveal that

the information Thompson told counsel was almost identical to his grand jury

testimony.  (*Id.*).  Since the record is clear that counsel knew this information well

in advance of trial, and had ample opportunity to call Thompson as a witness if he

so chose, Thompson's grand jury testimony was not "suppressed" within the meaning of *Brady*.  *Leka*, 257 F.3d at 100.  Since there was no *Brady* violation, counsel was not ineffective on this ground.

Petitioner fails to demonstrate that he was prejudiced by any of the alleged ineffective assistance or that the result of the trial could not be relied upon.  He also has not established that trial counsel's performance was constitutionally deficient. *Strickland*, 466 U.S. at 687.  Therefore, the petition on this ground should be denied.

**8.**   **<u>Sentence</u>**

Petitioner claims in Ground Seven that his sentence was harsh and excessive and violated his Eighth Amendment right to be free from cruel and unusual punishment.  (Dkt. No. 42, Pet. at Ground VII, Mem. at 21-23).  Respondent argues that this claim is not cognizable.  (Resp't Mem. at 29-30).

It is firmly established that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992); *Mayerhofer v. Bennett*, No. 02-CV-0074, 2007 WL 1624767, at *7 (N.D.N.Y. June 6, 2007).  Petitioner was convicted of first degree manslaughter.  The trial court was authorized to sentence him, as a second violent felony offender, to a maximum determinate term of twenty-five years in prison. N.Y. PENAL LAW §§70.04(3)(a), 125.20(1).  While Petitioner was

48

sentenced to the maximum term permissible, his sentence did not exceed it.

Petitioner's claim that he was deserving of a lesser sentence because he played a so-called secondary role in the assault is unavailing because judges have the authority to exercise broad discretion when imposing sentences. *See United States v. Booker*, 543 U.S. 220, 223 (2005); *Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir.1977). Petitioner also claims that he was punished for exercising his right to a jury trial because Buckley was sentenced to ten years in prison following a guilty plea.  (Mem. at 22-23).

The fact that the court, following conviction, imposed the maximum sentence does not, in itself, demonstrate actual vindictiveness. *See*, *e.g., Corbitt v. New Jersey*, 439 U.S. 212, 219, 223 (1978) ("We have squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea.... We discern no element of retaliation or vindictiveness against [appellant] for going to trial.  There is no suggestion that Petitioner was subjected to unwarranted charges. Nor does this record indicate that he was being punished for exercising a constitutional right.... There is no doubt that those homicide defendants who are willing to plead *non vult* may be treated more leniently than those who go to trial, but withholding the possibility of leniency from the latter cannot be equated with impermissible punishment as long as our cases sustaining plea bargaining remain undisturbed."); *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 (1973) (while confronting

49

a defendant with the risk of more severe punishment following trial may have a "discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices ... [is] an inevitable attribute of any legitimate system which tolerates and encourages the negotiation of pleas."). Since the imposed sentence was within the statutory range, this theory cannot afford Petitioner relief.

To the extent that Petitioner claims the sentence was cruel and unusual under the Eighth Amendment, that claim also does not warrant habeas relief. The Eighth Amendment forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction. *Lockyer,* 538 U.S. at 72-73; *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991). It is well-established that a sentence of imprisonment that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense. *See White*, 969 F.2d at 1383; *Lou v. Mantello*, No. 98-CV-5542, 2001 WL 1152817, at *13 (E.D.N.Y. Sept. 25, 2001). The Supreme Court has held that, for offenses less than manslaughter, sentences longer than 25 years are not grossly disproportionate. *See Staubitz v. Lord*, 03-CV-0671, 2006 WL 3490335, at *2 (E.D.N.Y. Dec. 1, 2006)(citing *Ewing v. California*, 538 U.S. 11 (2003)(25 years to life for grand theft) and *Harmelin*, 501 U.S. 957 (life in prison without the possibility of parole for cocaine possession)). Petitioner's sentence was not contrary to or an unreasonable application of that precedent. Since the sentence imposed was plainly within the limits authorized by statute, and was not grossly disproportionate

50

to the crime of conviction, this ground of the petition should be denied.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten

days within which to file written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS**

**REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of*

*Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72

Dated: January 9, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge